NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NEW JERSEY PRIMARY CARE ASSOCIATION, | |
| Plaintiff, | Civil No. 12-00413 (JAP) |
| v. | **OPINION** |
| STATE OF NEW JERSEY DEPT. OF HUMAN SERVICES, et al. | |
| Defendants. | |

PISANO, District Judge:

Plaintiff New Jersey Primary Care Association filed this action on January 24, 2012, against Defendants State of New Jersey Department of Human Services ("DHS"), Commissioner of DHS Jennifer Velez, DHS Division of Medical Assistance and Health Services ("DMAHS"), and Director of DMAHS Valerie Harr [docket entry no. 1]. This matter came before the Court when Plaintiff filed a Motion for a Preliminary Injunction on April 9, 2012 [docket entry no. 12]. Defendants opposed the Motion and filed a Motion for Summary Judgment [docket entries no. 18, 19]. Plaintiffs filed a Cross-Motion for Summary Judgment [docket entry no. 22]. The Court held oral argument on the Motion for a Preliminary Injunction on May 17, 2012, and continued that argument on June 1, 2012. For the reasons set forth below, the Plaintiff's Motions for Summary Judgment and for a Preliminary Injunction will be granted, and the Defendants' Motion for Summary Judgment will be denied.

1

I.      Background

Plaintiff New Jersey Primary Care Association ("NJPCA") is a 501(c)(3) corporation, with a membership including twenty community health centers.  These health centers are 501(c)(3) organizations that provide care to people in medically underserved communities, and they receive grant funding pursuant to the Public Health Service Act ("PHS funding") to subsidize care to patients who are uninsured and unable to pay.  42 U.S.C. § 254b(e), (k); 42 U.S.C. § 254c.  They are required to make every reasonable effort to obtain appropriate payment from insurers, including Medicaid.  42 U.S.C. § 254b(k)(3)(F).

A.  The Medicaid Statute

The federal Medicaid statute sets forth a program, jointly financed and operated by the federal government and the states, to provide health care services to people unable to pay.  42 U.S.C. § 1396.  States electing to participate in the Medicaid program must comply with the requirements of the Medicaid Act and regulations, *Sabree v. Richman*, 367 F.3d 180, 182 (3d Cir. 2004), and must submit their Medicaid plans to the federal government for approval.  *See* 42 U.S.C. § 1396a(b); 42 C.F.R. § 430.10.

The above-described PHS-funded health centers are certified as Federally Qualified Health Centers ("FQHC") for purposes of Medicaid reimbursement.  42 U.S.C. § 1396d(l)(2)(B).  The Medicaid statute regulates the relationship between FQHCs and Medicaid, including the manner in which a health center is paid for a Medicaid-covered service.  42 U.S.C. § 1396a(bb).  The Medicaid Prospective Payment System ("PPS") requires states to reimburse FQHCs for Medicaid-covered services on an "encounter" basis, at a predetermined rate per patient visit.  *Id.* at 1396a(bb)(2); N.J.A.C. § 10:66-4.1.  This is a standard figure for every patient encounter, calculated for each FQHC pursuant to a methodology set forth in the statute.  *Id.* at 1396a(bb)(2)

– (3). The statute requires that FQHCs be reimbursed for Medicaid-covered services at "100 percent of costs which are reasonable . . . as the Secretary prescribes . . . in regulations." *Id.* at 1396a(bb)(2). This ensures that PHS funds—which are meant to cover services for the uninsured—are not diverted to pay for services that should have been covered by Medicaid. H.R. Rep. No. 101-247, at 392-93, reprinted in 1989 U.S.C.C.A.N. 2118-19.

New Jersey participates in the Medicaid program pursuant to the New Jersey Medical Assistance and Health Services Act, N.J.S.A. § 30:4D-1. Defendant DMHAS is the State Agency that administers the program. N.J.S.A. § 30:4D-4, -5, -7. Pursuant to this plan, the State contracts with Managed Care Organizations ("MCO"), more commonly known as "Health Maintenance Organizations," or "HMOs." The MCOs, in turn, contract with the health centers providing the Medicaid-covered care. Federal law requires states contracting with MCOs to ensure that FQHCs are fully compensated for each patient encounter by making "a supplemental payment," equal to the difference between the health centers' reasonable costs and the amount paid by the MCO. *Id.* at 1396a(bb)(5)(A). This supplemental payment is referred to as "wraparound." N.J.A.C. § 10:66-1.2. The payments must be made pursuant to a schedule agreed upon by the State and FQHC, but must not be less frequent than every four months. 42 U.S.C. § 1396a(bb)(5)(B).

### B. New Jersey's Federally-Approved Medicaid Plan

New Jersey's Medicaid Plan provides for quarterly wraparound payments. N.J.A.C. § 10:66-1.5(vii). FQHCs must keep records for each service rendered to a Medicaid beneficiary that include "the name of the recipient to whom the service was rendered, the date of the Service Rendered, the nature and extent of each such service rendered and any additional information, as the department may require by regulation." N.J.S.A. § 30:4D-12(d). In order to obtain a

wraparound payment to make up the difference between the MCO payment and the total PPS reimbursement, the FQHCs must submit quarterly reports of their Medicaid-eligible encounters, and of the payments received from MCOs, to the State. N.J.A.C. § 10:66-1.5(d)(1)(vii). The New Jersey regulations require FQHCs to use specific forms for reporting which are incorporated by reference into the rules. *Id.*, *id.* at 10:66-4 App. E ("Medicaid Managed Care Encounter Detail Report" and "Managed Care Receipts Report"). DMAHS then calculates the wraparound payments by multiplying the number of FQHC encounters reported by the PPS rate, and then subtracting the total reported MCO receipts. Mot. for PI Ex. A ¶ 20 (Grant-Davis Decl.). Some of the encounters are completely unpaid by MCOs, which results in a wraparound payment that covers the full PPS rate for that encounter. *Id.* at ¶ 21. If the MCO later makes a payment for such an encounter, the State receives a credit against its next wraparound payment. N.J.A.C. § 10:66-1.5(10), (11).

### C. New Jersey's New Payment System

The following facts are not in dispute. In April of 2004, DMAHS invited FQHCs to participate in a meeting to discuss the Department's intent to improve its encounter "validation process," and evincing an intent to require more detailed claims data from the FQHCs in their quarterly wraparound reports. Opp. to Mot. Ex. A. Throughout the next several years, DMAHS communicated with the FQHCs about the Department's proposal to rely on MCO data to verify FQHC claims data. Both parties recognized important discrepancies between the two data systems. Opp. to Mot. Ex. B, C, D, E, F. In early 2011, DMAHS informed the FQHCs that it had performed a review of MCO data, and had discovered that ten percent of the claims denied by MCOs were never re-submitted for correction by the FQHCs, creating an increased cost to the state in making its wraparound payments. Opp. to Mot. Ex. G. The Department further

4

requested that the FQHCs perform of a comparative analysis of their own data with the MCO data. Opp. to Mot. Ex. H.

In June 2011, the State proceeded to change the wraparound payment system described above without amending its regulations. On June 9, 2011, DMAHS official Ronald Varella sent a letter to New Jersey FQHCs requiring them to submit seven specific "fields" of data for each Medicaid encounter beginning with their next quarterly report. Mot. for PI Ex. D. The NJPCA wrote to DHS Commissioner Jennifer Velez to request that DMAHS delay the implementation of this new policy by one quarter, but that request was denied. Mot. for PI Ex. F, G. On August 29, 2011, DHS Commissioner Velez informed the NJPCA that wraparound for FQHCs that "cannot reconcile their data" would be based on data from the MCOs, provided in two compact discs. Mot. for PI Ex. H. In September, two more "fields," referring to the amount and date of an MCO payment, were added to the data submission requirements for each encounter. Mot. for PI Ex. I ¶ 11. Along with this requirement, the DMAHS letter made clear that wraparound would only be provided after an MCO paid its contracted portion of the PPS rate. Thus, the FQHCs would receive no payment for an encounter if an MCO denied payment for any reason. Mot. for PI Ex. B ¶ 11 (Turbiner Decl. I); Ex. C ¶ 11 (Stokes Decl.); Ex. K.

The CEO of NJPCA and health center representatives communicated their concerns about New Jersey's new wraparound payment policy throughout the fall of 2011. Most importantly, the NJPCA and member FQHCs opposed making wraparound payment for an encounter contingent on prior payment by an MCO, because MCOs currently deny payment for many reasons that are unrelated to whether a claim qualifies as a Medicaid-covered encounter. DMAHS Director Valerie Harr and other DHS representatives, however, confirmed the State's shift to a new payment methodology. Mot. for PI Ex. J, K, L. The Plaintiff contends that the

5

FQHCs expended extra resources to attempt to comply with the State's new data requirements in a short timeframe.  Mot. for PI Ex. B ¶ 14 (Turbiner Decl.); Ex. C ¶¶ 13, 16, 18 (Stokes Decl.).

In December 2011, the FQHCs received a letter along with their quarterly wraparound payment stating that "the data provided by your facility was not satisfactorily populated for processing."  Mot. for PI Ex. M.  Defendants claim that the data submitted was incomplete or inaccurate.  Opp. to Mot. 7.  Thus, the State based its wraparound payments for that quarter not on the data from the FQHCs, but on data from the "Molina Medicaid Encounter System."  Mot. for PI Ex. B ¶ 14; Ex. C ¶ 13.  Molina is a third party that contracts with the State to collect data reported by the MCOs.  *Id.*  The Plaintiff contends that reliance on the Molina data effectively makes wraparound contingent on prior MCO payment, and that this has resulted in severe financial shortfalls to the health centers.  Declarants from the Plaintiff's member FQHCs also attest that the Molina data is very difficult to compare with their own submissions to the State, and that the State has not specified which of the encounters have been denied wraparound.  Thus, they must spend significant resources combing through the data and attempting to resubmit any denied claims.  *See, e.g.*, Ex. C, Stokes Decl. ¶ 16.  The Defendants have made some "advance" payments to certain FQHCs on a case-by-case basis to ameliorate severe cash shortages while the health centers prepare to resubmit claims.  *See, e.g.*, Opp. to Mot. 9.

### D.  The Commencement of this Litigation

Plaintiff filed this action on January 24, 2012, alleging that the State's failure to provide full PPS-rate payments not less than every four months violates the federal Medicaid statute, 42 U.S.C. § 1396a(bb).  The Complaint also alleges that the Defendants' actions violate the agency's own Medicaid regulations, and that the implementation of a new payment system without changing the existing regulations through a notice-and-comment rulemaking procedure

is arbitrary and capricious in violation of the Fifth and Fourteenth Amendments of the Constitution. They further allege that the new unauthorized payment system is an unlawful taking of the full payment to which they are entitled under federal law without due process, also in violation of the Fifth and Fourteenth Amendments. Finally, the Complaint alleges that the diversion of PHS funding due to the lack of necessary Medicaid payment violates the Appropriations and Supremacy Clauses of the United States Constitution.

## II.   Motions for Summary Judgment

A court shall grant summary judgment under Rule 56 of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether or not a fact is material is determined according to the substantive law at issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Celotex*, 477 U.S. at 324. The non-moving party must then offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Plaintiff claims, first in its Motion for a Preliminary Injunction and again in its Cross-Motion for Summary Judgment, that the Defendants' actions violate New Jersey's Medicaid regulations, the federal Medicaid statute, and the due process clause of the Fifth and Fourteenth Amendments. It contends that the State's violation of its own regulations is arbitrary

7

and capricious, and that the failure to make timely wraparound payments both violates the federal Medicaid statute and deprives the Plaintiff's member health centers of a property interest without due process of law.  Defendants do not dispute the State's obligation to make timely wraparound payments, but argues that this obligation is not triggered until DMAHS receives "verified" data on patient encounters and MCO payments.  Thus, the dispute between the parties centers on the State's recent changes to its Medicaid program; specifically, whether the State may unilaterally change the procedure by which it collects data and calculates wraparound, and whether the new procedures are themselves contrary to law.  The Court finds that these changes are unlawful, and that therefore the Plaintiff is entitled to Summary Judgment.  The Defendants have violated their own regulations and the federal Medicaid statute, depriving the FQHCs of a protected property interest in a manner that is arbitrary and capricious.

      The Medicaid statute and federal regulations provide specific requirements for state plans, 42 U.S.C. § 1396a(a), which must be approved by the federal government.  42 U.S.C. § 1396a(b); 42 C.F.R. § 430.10.  New Jersey's federally-approved Medicaid regulations describe the procedure by which FQHCs must submit data and receive wraparound.  N.J.A.C. § 10:66-1.5(d)(1)(vii);  N.J.A.C. § 10:66-4 App. E.  By unilaterally changing that procedure without amending the regulations, Defendants have effectively implemented a new plan before obtaining the necessary federal approval.  This constitutes a violation of the Medicaid statute's requirement that states obtain federal approval.  *See* 42 C.F.R. § 430.12(c) (states must amend their plans and submit these amendments for approval when there are "[m]aterial changes in State law, organization, or policy or in the State's operation of the Medicaid program.")  That the agency departed from its own regulations without amending them through a notice-and-comment rulemaking is not only a violation of the Medicaid statute, but it is also "arbitrary, capricious,

8

and an abuse of discretion or otherwise contrary to law." *Motor Vehicle Mfrs. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 41 (1983); *see W. Va. Univ. Hospitals, Inc. v. Casey*, 885 F.2d 11, 28 (3d Cir. 1989) (applying the "arbitrary and capricious" standard to Pennsylvania's Medicaid reimbursement scheme).

Defendants argue that the new data submission requirements are supported by existing law. They cite New Jersey's statutory requirement that FQHCs keep records of services provided to Medicaid beneficiaries, including the name of the recipient, the date of the service, the nature of the service, "and any additional information, as the department may require by regulation." N.J.S.A. 30:4D-12(d). This does not support the actions that Defendants have taken. First, the cited provision pertains to recordkeeping, and does not require FQHCs to submit this data on a quarterly basis in order to obtain wraparound. Second, it requires FQHCs to keep "additional information as the department may require *by regulation*," *id.* (emphasis added), not merely at the department's request. Defendants also cite the regulation requiring FQHCs to "furnish such information as may be requested by DMAHS." N.J.A.C. 10:49-9.8(b)(2). However, this provision cannot be read to allow DMAHS to freely amend procedures that are specifically provided elsewhere in the regulations. Otherwise, such general provisions would operate to nullify specific regulations at the agency's whim. The agency had no authority to change the quarterly reporting for wraparound purposes without amending the regulations specifically applicable to those reporting requirements.[1]

Furthermore, the new system is itself arbitrary and capricious. Prior MCO payment is not equivalent to eligibility for Medicaid. Thus, the Defendants' demand leading up to the

---

[1] The current regulations also require FQHCs to maintain an accounting system and documentation of costs, and to "submit other information (statistics, cost and financial data) when deemed necessary by the Department." N.J.A.C. 10:66-1.5(x)(5). Again, while this provision requires FQHCs to make their books available to the agency, it does not give the agency license to change the procedures outlined in the rest of the regulations.

9

implementation of the new system—that the FQHCs "reconcile" their data with MCO data—is without basis in the Medicaid statute. The parties agree that MCOs often deny claims for reasons unrelated to whether the encounter is covered by Medicaid. Denying wraparound for claims because they have been denied by MCOs therefore guarantees that some Medicaid-covered encounters will remain unpaid, and that many more will not be timely paid. In other words, the Defendants' new system actually guarantees that the State will violate the statute's mandate to make full and timely wraparound payment. This is true whether the agency gathers the MCO claims data from the health centers or from a third party. Thus, the Defendants' new system is arbitrary and capricious not only for the failure to follow any notice-and-comment rulemaking procedures, but because the new system itself fails to show a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.* v. *United States*, 371 U.S. 156, 168 (1962)). *See also Wilder v. Va. Hospital Ass'n*, 496 U.S. 498 (1990) (Medicaid's "reasonable and adequate" cost requirement was "not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care."). At the very least, prior MCO payment is a factor "which Congress has not intended [the agency] to consider" in determining whether an encounter is eligible for Medicaid coverage.[2] *State Farm*, 463 U.S. at 43.

The Court further finds that the financial shortfalls resulting from this unlawful agency action have deprived the Plaintiff's member health centers of their property without due process of law. Undoubtedly, the FQHCs have a "legitimate claim of entitlement" to full and timely wraparound payments. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972)). A constitutionally-

---

[2] Of course, MCO payment must be considered in calculating wraparound payments, which the Plaintiff does not dispute.

recognized property interest arises when the government "creates an entitlement to some benefit." *Paul v. Davis*, 424 U.S. 693, 709 (1976). As described above, FQHCs are entitled by the Medicaid statute to receive full and timely wraparound payments to cover their costs, which must be determined according to specific statutory guidelines. The failure to fully compensate the FQHCs for all Medicaid-eligible encounters deprives them of their property interest in those supplemental payments. Because this change was unilateral and not accompanied by a notice-and-comment rulemaking procedure, this deprivation was without due process. *See*, *e.g.*, *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950) (due process includes two components: notice and an opportunity to be heard); *Ortiz v Eichler*, 794 F.2d 889, 893 (3d Cir. 1986). The FQHCs are also denied due process in the denial of specific claims, as their only recourse is the MCO appeals process—a private contractual remedy which may bear little relation to whether a disputed claim is eligible for Medicaid coverage. *See* N.J.A.C. § 11:22-1.8.

Defendants argue that their statutory obligation to make wraparound payments is not triggered until they receive accurate claims data from which to calculate the proper payment amount, and that the Medicaid statute gives them the authority to require more information from the FQHCs in order to verify their claims. They further argue that they can lose their federal funding for the Medicaid program if they do not sufficiently verify each covered encounter. The Plaintiff does not dispute the State's statutory authority to require more information, and Court agrees that the State has a compelling interest in maintaining federal funding. However, this argument fails in three ways.

First, the State's new system does not serve the purported goal of claim verification. As explained in further detail above, payment by an MCO is often unrelated to whether an encounter meets the statutory criteria for Medicaid eligibility, so the new system does not provide accurate

verification.  The changes implemented by the Defendants apparently arose out of concerns about the discrepancies between MCO data and FQHC data.  However, Defendants have not explained why they have targeted the FQHCs to resolve these discrepancies rather than the MCOs, which process claims according to internal rules that may be unrelated to the Medicaid statute.  The very requirement that states make wraparound payments is evidence of Congress's concern that MCOs would not fully compensate FQHCs for all Medicaid-eligible encounters.  Second, the Defendants have not explained to the Court how the existing plan, which was approved by the federal government pursuant to the statute, has jeopardized the State's federal funding.  Defendants have only cursorily implied—but have not proven—that the FQHCs were not providing complete and accurate data before the changes were made.[3]  Finally, the threat of funding loss cannot cure the illegality of the State's new system.  The Defendants' unilateral changes in data collection and wraparound calculation are procedurally deficient and without statutory authority as described above.

      For the foregoing reasons, the Court finds that there is no issue of material fact as to the Defendants' recent changes in the methods for collecting data and calculating wraparound payments.  These actions violate the State's own regulations, the Medicaid statute, and the Fifth and Fourteenth Amendments of the United States Constitution.  The State's purported justifications for these changes are legally insufficient.  Thus, the Plaintiff is entitled to Summary Judgment.

---

[3] Passing reference was made during oral argument to the fact that the State had not sufficiently enforced the reporting requirements for years, and that the changes were the result of renewed attempts at enforcement.  The Defendants thus imply, but have not attempted to demonstrate to the Court, that the FQHCs have been so persistent in their violations of reporting requirements that enforcement efforts were unavailing, forcing both a unilateral change in procedure and the use of third-party data.  Even if the Defendants had argued this explicitly, the State's own enforcement failures cannot justify implementing an unlawful new system in a procedurally defective manner.

### III. Motion for Preliminary Injunction

In evaluating a motion for preliminary injunctive relief, a court must consider whether: "'(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'" *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (quoting *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998)). A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Preliminary injunctive relief is an "extraordinary and drastic remedy," *id.*, which "should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994). "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).

#### A. Likelihood of Success on the Merits

The parties' Cross-Motions for Summary Judgment substantially replicated their arguments on likelihood of success on the merits in support of and in opposition to injunctive relief. The Court will not replicate its own analysis here. Plaintiff having prevailed on its Motion for Summary Judgment, there is no longer any question as to its likelihood of success on the merits.

B. **Irreparable Harm**

Continuing with the preliminary injunction analysis, the Court must next consider whether "denial will result in irreparable harm to the plaintiff" and whether "granting the injunction will not result in irreparable harm to the defendant." *NutraSweet*, 176 F.3d at 153 (citations omitted). To the extent that the harm about which Plaintiffs complain is self inflicted, Plaintiffs cannot show irreparable harm under the preliminary injunction. *See Caplan v. Fellheimer Eichen Braverman & Kaskey,* 68 F.3d 828, 839 (3d Cir. 1995); *Borough of Palmyra, Bd. of Educ. v. F.C. Through R.C.*, 2 F.Supp.2d 637, 644 (D.N.J. 1998). "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be adequately compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.,* 204 F.3d 475 (3d Cir.2000); see *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988).

Plaintiff argues that it lacks a remedy at law in this case, because the Eleventh Amendment bars courts from ordering retroactive monetary damages that must be paid from a state treasury. *See Edelman v. Jordan*, 415 U.S. 615, 677 (1974). Indeed, the Third Circuit has held that the unavailability of retroactive damages is sufficient to make harm irreparable. *New Jersey Retail Merchants Ass'n. v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012); *Murray v. Silberstein*, 882 F.2d 61, 63 (3d Cir. 1989). The Defendants argue that this law is irrelevant, because money damages are unnecessary where FQHCs are independently entitled to wraparound payment once their claims have been validated. This is tantamount to claiming that money damages will not be necessary because the Plaintiff's legal argument is incorrect. Defendants erroneously assume that the new "validation" system is lawful and therefore sufficient to compensate the FQHCs. In fact, the Plaintiff has shown that its member FQHCs

14

have been deprived of funds to which they are legally entitled.  It is unclear how the State intends to compensate FQHCs for claims that were unpaid under the unlawful system that has recently been in place.

Even if the Plaintiff did have access to money damages in this case, it has made extensive factual allegations supporting the contention that the FQHCs are experiencing significant harm due to dramatic loss of funding.  Plaintiff alleges that its member FQHCs have had to make layoffs, reduce medical services, and borrow money, and that some may even be in danger of closing their doors permanently.  The Third Circuit has recognized that even "purely economic injury" may constitute irreparable harm "where the potential economic loss is so great as to threaten the existence of movant's business."  *Minard Run Oil Co. v. United States Forest Service*, 670 F.3d 236, 255 (3d Cir. 2011) (citing *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009); *Doran v. Salem Inn, Inc*., 422 U.S. 922, 932 (1975)).  Such allegations are particularly compelling in this case, where the "businesses" at risk are not sellers of ordinary consumer products, but rather non-profit healthcare providers serving those who are unable to obtain care elsewhere.

The State has a substantial interest in protecting its Medicaid funds from both fraudulent claims from health centers and from the revocation of federal money.  However, it has provided little evidence suggesting that either of these threats exist.  Furthermore, states do not "have an interest in the enforcement of an unconstitutional law." *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003).

Thus, the Court finds that the balance of the equities favors the Plaintiffs.  This finding is bolstered by the fact that the failure to make supplemental payments under the Medicaid statute has justified preliminary injunctive relief in other courts.  *See, e.g.*, *Concilio e Salud Integral de*

15

*Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 17-18 (1st Cir. 2008); *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56, 74-77 (1st Cir. 2005); *Three Lower Counties Cmty. Health Servs. v. Maryland*, 498 F.3d 294, 301 (4th Cir. 2007); *Cedar-Riverside People's Center v. Minn. Dep't of Human Servs.*, No. 09-768, 2009 WL 1955440 (D. Minn. July 6, 2009).

### C. The Public Interest

The final determination with respect to whether a party is entitled to preliminary injunction is whether "granting the injunction is in the public interest."' *NutraSweet*, 176 F.3d at 153. Congress has established and funded extensive programs to allow FQHCs to provide care to underserved communities. It has dedicated PHS funding so that the health centers may care for the uninsured and unable to pay, and it has regulated the relationship between FQHCs and the Medicaid program so that they may care for Medicaid-eligible persons. The continued existence of these FQHCs, and their continued ability to provide care to these underserved communities, is undoubtedly in the public interest.

The public has a significant interest in ensuring that tax dollars are spent in a lawful manner, and that Medicaid funding is not wasted due to inaccurate reporting or lost due to the revocation of federal approval of New Jersey's Medicaid plan. As explained above, however, the Defendants have not satisfied the Court that these public interests are threatened by New Jersey's federally-approved Medicaid plan. Nor has it satisfied the Court that the new, unauthorized system would serve its purported goals. Thus, the public interest favors granting injunctive relief to the Plaintiff.

### IV. Conclusion

For the reasons set forth above, the Plaintiff has prevailed on its claim that the State of New Jersey's recent changes to its Medicaid program violate its own regulations, the federal Medicaid statute, and the Fifth and Fourteenth Amendments of the United States Constitution. The Plaintiff has further demonstrated that its member health centers will suffer irreparable harm without injunctive relief, and that the public interest favors the granting of such relief.

However, the Court notes that the parties are involved in ongoing negotiations over establishing a new data collection and wraparound payment system. Both parties are engaged in a good-faith effort to resolve their differences and create a new system that complies with federal and state law. While the Plaintiff has established that it is entitled to summary judgment on the issue of whether or not Defendants' past actions violate the law, there are complex issues of fact relevant to the establishment of a new system, which are unsuited to resolution by the Court. Thus, the Court will exercise its equitable powers to grant limited injunctive relief and retain jurisdiction over the case. An appropriate Order follows.

    /s/ Joel A. Pisano_____
JOEL A. PISANO
United States District Judge

Dated: July 5, 2012